**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-3547
_____

UNITED STATES OF AMERICA

v.

CARLTON WILLIAMS,

Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D. C. Criminal No. 2-14-cr-00030-001)
District Judge: Honorable Terrence F. McVerry

_____

Argued on May 24, 2017

Before: HARDIMAN, ROTH and FISHER, Circuit Judges

(Opinion filed: August 1, 2018)

Kimberly R. Brunson, Esq.        (**ARGUED**)
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222

Counsel for Appellant

Donovan J. Cocas, Esq.        (**ARGUED**)
Rebecca R. Haywood, Esq.
Michael L. Ivory, Esq.
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

Counsel for Appellee

––––––––––––––––

OPINION

––––––––––––––––

ROTH, <u>Circuit Judge</u>

During an investigation, federal law enforcement officials learned that Carlton Williams was involved in the distribution of heroin. The investigation involved surveillance of Williams's activity, which eventually led to a stop of his car. During the traffic stop, law enforcement officials conducted a search of Williams's car and its contents. As they expected, the officials discovered drugs

during the search. Williams subsequently pleaded guilty to possession of heroin with intent to distribute in violation of federal drug laws. Williams now appeals the denial of his suppression motion and application of the United States Sentencing Guidelines' career offender enhancement. Finding no merit in either claim, we will affirm Williams's conviction and sentence.

## I.

### A. Factual Background

The underlying facts are uncontested. During an investigation that began as early as November 2012, a Drug Enforcement Administration task force officer learned that Williams bought heroin in Detroit, Michigan, which he packaged and sold in Pittsburgh, Pennsylvania. The officer subsequently placed a GPS tracker on Williams's car and monitored his movements for approximately one month. On January 11, 2013, data from the GPS tracker indicated that Williams's car was driven to Detroit. Suspecting that Williams drove his car to Detroit to retrieve heroin, the task force officer organized a plan to have Williams's car stopped upon its return to Pennsylvania. Pennsylvania State Police trooper Michael Volk effectuated the traffic stop.

Later that same evening, Trooper Volk observed Williams's car speeding and stopped it. The trooper issued a citation for the traffic violation and told Williams that he was free to go. Before Williams left, however, Trooper Volk asked Williams for consent to search his car. Williams agreed and signed a consent to search form labeled "Waiver of Rights and Consent to Search." The parties do not dispute

3

that Williams knowingly, intelligently, and voluntarily consented to the search of his car, its contents, and his person.

Trooper Volk, with the help of other troopers, commenced a search of Williams's car that lasted for approximately seventy-one minutes. The troopers searched every part of the car, including its passenger compartment, trunk, and undercarriage. Unable to locate any narcotics, Trooper Volk requested the assistance of a narcotics-detection dog. Shortly thereafter, Trooper Volk updated another trooper on the progress of the search and indicated that "[the search] was going to take awhile [because] he hadn't found [the heroin], but the K-9 was on its way coming from a distance."[1]

Williams eventually became less patient and told Trooper Volk "you searched my car three times, now you hold me up and I have to go."[2] According to Williams, he made this statement in only "a regular tone of voice that he expected Trooper Volk to hear but [the trooper] was at a distance and there was a lot of noise from the turnpike traffic and the wind."[3] Other than Williams's own testimony, there was no evidence that Trooper Volk heard his alleged protest. The District Court, as a result, found Williams's testimony "only credible to a degree."[4]

The troopers continued their search despite Williams's irritation. As the search continued, Williams requested five

---

[1] *United States v. Williams*, 2015 WL 5602617, at *6 n.5 (W.D. Pa. 2015).
[2] *Id.* at *6.
[3] *Id.*
[4] *Id.*

4

items from his car, including his two cellular phones. One of the troopers retrieved Williams's cellular phones and attempted to search them before handing them over to Williams. The trooper was able to read the text messages contained on only one of the devices because the other device was password-protected. The trooper who read Williams's text messages told Trooper Volk that the messages suggested that Williams had "something."[5] When Williams was confronted about the text messages, he warned the officers that they could not search his phone without a warrant.

The search of the car continued. After fifty-one minutes, the troopers had not discovered any drugs. They began to disassemble Williams's sound system speakers. Williams objected that the troopers were not permitted to search his speakers without a warrant. Trooper Volk told Williams to "relax," to which Williams replied, "I've been out here half an hour, man."[6] Upon Williams's protest, Trooper Volk reassembled the car's speakers but otherwise continued searching the vehicle. Soon after, and seventy-one minutes into the search, Trooper Volk discovered thirty-nine grams of heroin in a sleeve covering the car's parking brake lever. Williams was immediately arrested.

## B.  Procedural History

Williams was charged with possession of heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). He filed a number of pretrial motions, including a motion to suppress the evidence seized from his

---

[5] App. 222.
[6] *Williams*, 2015 WL 5602617, at *6.

car.  Following a two-day hearing and the submission of post-hearing briefing, the District Court denied Williams's suppression motion, because it concluded that Williams had voluntarily consented to the search and had not unequivocally withdrawn his consent during the search.

Prior to Williams's sentencing, the United States Probation Office prepared a Presentence Investigation Report (PSR), which the District Court adopted without change.  The sentencing range calculation included U.S.S.G. § 4B1.1's career offender enhancement because the District Court concluded that Williams had two prior convictions for controlled substance offenses:  a 2007 conviction for possession with intent to distribute heroin and a 1998 conviction under 18 U.S.C. § 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act (RICO).  Williams admitted to various predicate acts forming the basis for his § 1962 RICO conviction, all of which were for possession with intent to distribute either crack cocaine or heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 841(b)(1)(B)(iii), and 846.[7]  As a result of the career offender enhancement, Williams faced a Guidelines sentencing range of 210-262 months.  On May 11, 2016, Williams entered a conditional guilty plea, preserving his right to appeal the denial of his suppression motion and the application of the Guidelines' career offender designation.  Williams was sentenced to, *inter alia*, a term of 160 months' imprisonment.  This appeal followed.

Williams appeals both the denial of his suppression motion and the District Court's application of the Guidelines'

---

[7] Supp. App. 19-25.

6

career offender designation. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We exercise appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).[8]

## II.

"We review the District Court's denial of a motion to suppress for clear error as to the underlying factual findings, and we exercise plenary review of its application of the law to those facts."[9] "'A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"[10] Therefore, "'[i]f the [D]istrict [C]ourt's account of the evidence is plausible in light of the record viewed in its entirety,' we will not reverse it even if, as the trier of fact, we would have weighed the evidence differently."[11]

### A. The District Court Properly Denied Williams's Motion to Suppress

With respect to his suppression motion, Williams claims that the District Court erred in denying his suppression

---

[8] *United States v. Johnson*, 587 F.3d 203, 207 (3d Cir. 2009).

[9] *United States v. Bansal*, 663 F.3d 634, 651-52 (3d Cir. 2011) (citing *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002)).

[10] *United States v. Price*, 558 F.3d 270, 276-77 (3d Cir. 2009) (quoting *United States v. Pelullo*, 173 F.3d 131, 135 (3d Cir. 1999)).

[11] *Price*, 558 F.3d at 277 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)).

motion because he properly withdrew his consent to the search or was improperly prevented from doing so.

It is well settled that the Fourth Amendment protects suspects from unreasonable searches.[12] "[A] search conducted without a warrant issued upon probable cause is [presumptively] unreasonable . . . subject only to a few specifically established and well-delineated exceptions."[13] A search conducted with consent is one such "established exception."[14] The appellant concedes that the search here began as a consensual one. He contends, however, that the search ceased to be so when he withdrew his consent or was prevented from doing so. Before reaching the issue of whether Williams withdrew his consent in this case, we must first determine whether the Fourth Amendment allows the subject of a consensual search to terminate the search by withdrawing his consent. Neither this Court nor the Supreme Court has expressly established that the subject of a consensual search may withdraw consent that he has voluntarily given. The Supreme Court, however, has recognized that a person may "delimit as he chooses the scope of the search to which he consents."[15] In so holding, the Court has instructed that the standard for measuring the limitations placed on a consensual search "is that of objective reasonableness."[16] Thus, in determining the legal bounds of a

---

[12] U.S. Const. Amend. IV.

[13] *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks omitted) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).

[14] *Id*. at 219 (citations omitted).

[15] *Florida v. Jimeno*, 500 U.S. 248, 252 (1991).

[16] *Id*. at 251 (internal quotation marks omitted).

consensual search, we must determine "what would the typical reasonable person have understood by the exchange between the officer and the suspect."[17] Relying on *Florida v. Jimeno*'s recognition that a consensual search may be restricted by individuals, our sister circuits that have considered whether individuals may withdraw consent to search have unanimously answered in the affirmative.[18] Today, we join them.

Although the Supreme Court has not itself expressly held that the subject of a consensual search may terminate the search by withdrawing his consent, considerable support for such a proposition is easily found in its Fourth Amendment

---

[17] See *Jimeno*, 500 U.S. at 251 (applying a reasonable person standard for determining the scope of consent).

[18] *See United States v. Dyer*, 784 F.2d 812, 816 (7th Cir. 1986) ("Clearly a person may limit or withdraw his consent to a search, and the police must honor such limitations."); *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999) ("[T]he consenting party may limit the scope of that search, and hence at any moment may retract his consent"); *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005) ("Once given, consent to search may be withdrawn[.]"); *United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006) ("A suspect is free, however, after initially giving consent, to delimit or withdraw his or her consent at anytime."); *see also United States v. Pelle*, No. 05-407, 2006 WL 436920, at \*4 (D.N.J. Feb. 17, 2006) ("The courts which have decided the issue, however, have unanimously answered that question in the affirmative, generally holding that any such withdrawal must be supported by unambiguous acts or unequivocal statements.") (collecting cases).

9

jurisprudence. The Court recognized in *Walter v. United States*,[19] and later in *Jimeno*,[20] that a consensual search satisfies the mandates of the Constitution only if conducted within the boundaries of the consent given. This recognition establishes that it is the subject of a consensual search who decides the terms of the search. Although *Walter* and *Jimeno* expressly consider only a party's right to limit the particular things officials may search, nothing in those opinions suggests that consent, which waives Fourth Amendment rights, cannot otherwise be narrowed, qualified, or withdrawn. That a party may terminate a search by withdrawing his consent is a corollary of the recognition that the subject of a consensual search determines the parameters of that search.

Moreover, recognition of a party's right to take away the consent that he or she has conferred advances society's interest in promoting consensual searches. The Supreme Court has acknowledged that consensual searches are important because they promote the effective enforcement of criminal laws.[21] This is particularly true where there is lack of probable cause to arrest or search because, in such

---

[19] 447 U.S. 649, 656 (1980) ("When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization.").

[20] 500 U.S. at 252.

[21] *Schneckloth*, 412 U.S. at 228 ("[A] search pursuant to consent may result in considerably less inconvenience for the subject of the search, and, properly conducted, is a constitutionally permissible and wholly legitimate aspect of effective police activity.").

situations, "a search authorized by a valid consent may be the only means of obtaining important and reliable evidence."[22] Moreover, a rule restricting the ability to withdraw consent would likely discourage people from consenting to searches when they otherwise might have done so. In the present case, for example, Williams voluntarily authorized the troopers to conduct a search. He then admonished the troopers that the search of his speakers and electronic devices was not within the bounds of his authorization. As a result, the troopers reassembled the speakers and ceased examining the phone that was not password-protected. However, "where a suspect does not withdraw his valid consent to a search for illegal substances before they are discovered, the consent remains valid and the substances are admissible as evidence."[23]

Turning to the merits of this case, we must decide whether Williams actually withdrew his consent. As the parties note, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'"[24] Thus, in determining whether suspects have withdrawn their consent to a search, courts have been guided by how a reasonable person would have understood the exchange between law enforcement

---

[22] *Id*. at 227 (citation omitted).

[23] *Dyer*, 784 F.2d at 816.

[24] *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted).

officers and suspects.[25] Courts agree that a reasonable person would not understand certain equivocal acts or statements to convey a suspect's desire to withdraw consent that he has voluntarily conferred.[26] Ambiguous acts and statements do not ordinarily lend themselves to a conclusive determination of whether consent has been withdrawn. Once it has been established that a suspect has voluntarily consented to a search, it is his burden to demonstrate that he has withdrawn that consent by pointing to an act or statement that an objective viewer would understand as an expression of his desire to no longer be searched.

With these principles in mind, we hold that the circumstances here do not demonstrate that Williams withdrew his consent to the troopers' search of his car. Williams knew how to express the absence of consent to search. As the record demonstrates, Williams told the troopers that they did not have consent to search his speakers

---

[25] *See e.g., United States v. Martel-Martines*, 988 F.2d 855, 858 (8th Cir. 1993); *see also Jimeno* 500 U.S. at 251 ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness— what would the typical reasonable person have understood by the exchange between the officer and the suspect?" (citations omitted)).

[26] *See, e.g., United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 820 (7th Cir. 2013) ("[P]olice officers do not act unreasonably by failing to halt their search every time a consenting suspect equivocates."); *Martel-Martines*, 988 F.2d at 858 (requiring "'unequivocal act or statement of withdrawal'" (quoting *United States v. Alfaro*, 935 F.2d 64, 67 (5th Cir. 1991)).

or his cellular phones. The search of those areas then stopped.

Williams also argues that he conveyed withdrawal of his consent to search the car when he complained that he had been standing "out [there] half an hour" and after he told officer Volk "you searched my car three times [and] y'all got me on the side of this road in the middle of the winter holding me up and I got to go."[27] The District Court held that Williams's comments only "constituted manifestations of irritation" and not statements indicating that he was withdrawing the consent he had conferred.[28] We agree. Although defendants need not use a special set of words to withdraw consent, they must do more than express unhappiness about the search to which they consented.

Other courts have reached the same conclusion when presented with similar facts. For example, the Eighth Circuit Court of Appeals in *United States v. Gray* held that a suspect had not withdrawn consent simply by objecting that the search was "ridiculous" and that he was "ready to go."[29] The court held that such statements amounted only to "expressions of impatience."[30] The court warned that "protests about the length of time the search was taking without any specific request to leave did not under the circumstances" amount to a withdrawal of consent.[31]

---

[27] *Williams*, 2015 WL 5602617, at *6; App. 196, 198-99.

[28] *Williams*, 2015 WL 5602617 at *9.

[29] 369 F.3d 1024, 1026 (8th Cir. 2004).

[30] *Id.*

[31] *U.S. v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005) (citing *Gray*, 369 F.3d at 1026).

13

Similarly, Williams's statements here were expressions of frustration. Williams falls short of meeting his burden of proof to establish that his consent was withdrawn.

Williams alternatively contends that, even if he did not withdraw his consent to the search, the evidence should be suppressed because the "coercive" nature of the search prevented him from revoking consent.

The Fourth Amendment requires that consent not be coerced.[32] The question of whether Williams's consent was at any point the product of coercion is "a question of fact determined from the totality of the circumstances."[33] In assessing the voluntariness of a suspect's consent, we consider "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment."[34] Our analysis "must accord the district court's conclusion that [Williams]'s consent was [voluntary] great deference, unless our examination of the record shows that the district court committed clear error."[35] Thus, the District Court's finding that Williams's consent was voluntary will not be overturned unless it is "(1) completely devoid of minimum evidentiary

---

[32] *Schneckloth*, 412 U.S. at 228.

[33] *United States v. Antoon*, 933 F.2d 200, 203 (3d Cir. 1991).

[34] *Price*, 558 F.3d at 278 (citing *Schneckloth*, 412 U.S. at 226; *United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994)).

[35] *Antoon,* 933 F.2d at 204 (citation omitted).

support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data."[36]

Our assessment of the totality of the circumstances precludes us from concluding that the District Court committed clear error. As the District Court noted, Williams's interaction with the troopers was not hostile. The troopers neither made threats nor showed force. No restraints were employed at the time of the search. The District Court's finding that Williams exhibited his ability to intelligently delimit the scope of the search is supported by the record. Accordingly, the District Court did not err in finding that, throughout the entire encounter, Williams's grant of consent was not the product of coercion.

## B. The District Court Properly Applied the Guidelines' Career Offender Enhancement

Williams next appeals his career offender designation, arguing that his 1998 RICO conviction—predicated on his distribution of heroin and crack cocaine—was not a requisite "controlled substance offense" under the Sentencing Guidelines. We disagree.

Under the Sentencing Guidelines, a defendant must be sentenced as a "career offender" if: (1) he was at least eighteen years old when he committed the instant offense of conviction; (2) the instant offense is a felony crime of violence or controlled substance offense; and (3) he has at

---

[36] *Id.* (quoting *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir.1972)).

least two prior felony convictions for a crime of violence or controlled substance offense.[37]

In this case, there is no dispute that the instant offense—possession with intent to distribute heroin in violation of §§ 841(a)(1) and 841(b)(1)(C)—is a controlled substance offense. Nor is there any doubt that Williams was at least eighteen at the time. The parties agree that Williams's 2007 conviction for possession with intent to distribute heroin supplies one of the two required prior felony convictions. The 1998 RICO conviction, we now hold, supplies the second.

Ordinarily, to determine whether a prior conviction qualifies as a crime of violence or controlled substance offense, we apply a categorical approach.[38] We consider only the elements of the crime of conviction and assess whether they fall within the bounds of a crime of violence or controlled substance offense, as defined under the Guidelines.[39] To avoid the "practical difficulties and potential unfairness" inherent in "determining the precise facts underlying a defendant's [prior] conviction," which may have occurred years or decades ago, we do not excavate or dissect the underlying factual record.[40]

---

[37] U.S.S.G. § 4B1.1(a).

[38] *Taylor v. United States*, 495 U.S. 575, 588 (1990).

[39] *See, e.g.*, *United States v. Chapman*, 866 F.3d 129, 133 (3d Cir. 2017).

[40] *United States v. Robinson*, 844 F.3d 137, 142 (3d Cir. 2016).

16

There is an exception, however. When a crime is defined with alternative elements, we may review a limited set of documents—including the indictment and plea colloquy, among others—but only to determine which version of the statute formed the basis of the prior conviction.[41] Such a statute is termed "divisible" and this approach—a more record-invasive variant of the categorical approach—is called the "modified categorical approach."

RICO, in particular Section 1962(c), is one such divisible statute. That statutory subsection, the basis for Williams's 1998 RICO conviction, proscribes "conduct[ing] . . . [an] enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." It proscribes two alternative forms of conduct: *either* racketeering activity *or* the collection of unlawful debt. That fork in the statute has even more branches. "Racketeering activity," a statutory phrase without independent meaning, has "constituent parts" or alternative "elements" that need to be proven beyond a reasonable doubt to sustain a conviction.[42] Under RICO, those elements are known as "predicate acts" and include certain violations of federal law, including "fraud connected with a case under title 11," or "fraud in the sale of securities," or "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a

---

[41] *Descamps v. United States*, 570 U.S. 254, 261-62 (2013) (reiterating that, for purposes of this inquiry, we may not examine a defendant's prior conduct).

[42] *Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016); *see also* 3d Cir. Model Crim. Jury Instr. 6.18.1962C-6 (2018) (establishing that the government must prove predicate acts beyond a reasonable doubt to sustain a conviction).

17

controlled substance or listed chemical."[43] Without consulting the record, we would not know which of these multiple alternatives yielded Williams's prior RICO conviction.

Fortunately, because Section 1962(c) is divisible, we may consult select portions of the record under the modified categorical approach to make that determination. The superseding indictment and Williams's 1998 plea colloquy are illuminating. They reveal that Williams pleaded guilty to a RICO violation under Section 1962(c) and five underlying RICO predicate acts.[44] All five of those predicate acts of racketeering were violations of 21 U.S.C. § 841(a)(1)—or conspiracy to commit such a violation under 21 U.S.C. § 846.[45] Specifically, he admitted to "manufactur[ing], distribut[ing], or dispens[ing], or possess[ing] with intent to manufacture, distribute, or dispense" heroin or crack cocaine.[46] Without probing the record further or examining Williams's prior conduct, we now know that Williams's prior RICO conviction necessarily implicated only a limited portion of 18 U.S.C. § 1961(1)(D), namely, only the "felonious manufacture," or "recei[pt]," or "buying, selling, or otherwise dealing in a controlled substance."[47] This limited and non-fact-intensive review of the record unmasks the specific version of the RICO statute under which Williams was convicted: "conduct[ing] . . . [an] enterprise's affairs" through "a pattern of racketeering activity" by

---

[43] 18 U.S.C. § 1961(1)(D).
[44] App. 324.
[45] Supp. App. 19-25.
[46] 21 U.S.C. § 841(a)(1).
[47] 18 U.S.C. § 1961(1)(D)

18

"felonious[ly] manufactur[ing]," or "receiving," or "buying, selling, or otherwise dealing in a controlled substance or listed chemical."[48]

The final step in this analysis is to assess whether the offense of conviction—as decoded by this selective review of the record—sweeps any more broadly than the relevant generic offense,[49] in this case a "controlled substance offense" as defined in the Guidelines. Section 4B1.2 of the Guidelines defines a "controlled substance offense" as "the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense."[50] The specific version of RICO implicated by Williams's prior conviction encompasses only the "felonious manufacture," or "recei[pt]," or "buying, selling, or otherwise dealing in a controlled substance": It is categorically a subset of the Guidelines' definition of a "controlled substance offense." For that reason, Williams's prior RICO conviction was a "controlled substance offense" under the Guidelines.

Because both his 2007 heroin distribution conviction and his 1998 RICO conviction were prior felony convictions for controlled substance offenses, the District Court correctly applied the career offender enhancement to Williams.

---

[48] *Id.* §§ 1961(1)(D), 1962(c).
[49] *Mathis*, 136 S. Ct. at 2249.
[50] U.S.S.G. § 4B1.2(b).

**III.**

For the foregoing reasons, we will affirm the judgment of the District Court.

HARDIMAN, *Circuit Judge*, concurring in part and concurring in the judgment.

I agree with my colleagues that the District Court did not err when it denied Williams's motion to suppress evidence. I also agree that Williams is—as the District Court found—a career offender under § 4B1.1 of the United States Sentencing Guidelines (2015) (USSG). As to that second issue, I concur in the judgment only because I cannot subscribe to the Majority's modified categorical approach, which I believe misapplies the Supreme Court's decisions in *Taylor v. United States*, 495 U.S. 575 (1990), and *Mathis v. United States*, 136 S. Ct. 2243 (2016). But because a proper application of the modified categorical approach would yield absurd results in cases involving RICO predicate offenses, I am convinced that the Supreme Court would not apply it here. Accordingly, I agree with my colleagues that Williams is a career offender.

At the outset, it's important to note that the Supreme Court has not yet applied *Taylor* (or *Mathis*) in a case involving a RICO predicate offense. And although some of our sister courts have adjudicated cases involving the interplay between RICO and the § 4B1.1 career offender guideline, they have not settled on a consistent mode of analysis. For example, the Ninth Circuit placed "the focus of the inquiry . . . on the *conduct* for which [the defendant] was convicted" without mentioning the categorical approach or citing *Taylor*. *United States v. Scott*, 642 F.3d 791, 801 (9th Cir. 2011) (per curiam). The First Circuit has taken a different tack, explaining that in determining whether a RICO conviction counts toward the career offender enhancement, courts should "in fidelity to *Taylor* principles . . . merely assess the nature and object of the racketeering activity as described in the indictment and fleshed

1

out in the jury instructions." *United States v. Winter*, 22 F.3d 15, 19–21 (1st Cir. 1994). Like the First Circuit, a panel of the Eleventh Circuit professed fealty to *Taylor*, but it looked to "the facts to which [the defendant] stipulated" in comparing the conduct underlying the defendant's prior racketeering conviction with the definition of a "controlled substance offense" under USSG § 4B1.2(b). *United States v. Rosquete*, 208 F. App'x 737, 739–41 (11th Cir. 2006) (per curiam).

Here, my colleagues have chosen to follow the path marked by the Supreme Court in *Taylor* and *Mathis*. And if the *Taylor/Mathis* framework applies to this case, the Majority is quite right that the relevant statute (18 U.S.C. § 1962(c)) is divisible, which requires application of the modified categorical approach.

But the modified categorical approach yields a result contrary to the one the Majority reaches. Section 1961(1)(D), which specifies the type of racketeering activity Williams was engaged in, is *not* "categorically a subset of the Guidelines' definition of a 'controlled substance offense.'" Maj. Op. 19. Under Guidelines § 4B1.2(b), a "controlled substance offense" encompasses "the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." That definition differs from Williams's RICO conviction, which involved "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States." 18 U.S.C. § 1961(1)(D). A comparison of the two provisions makes clear that Williams's RICO offense

encompasses conduct that § 4B1.2(b) does not cover, such as "receiving, concealment, buying . . . or otherwise dealing in a controlled substance." *See id.* Because it "sweeps more broadly than the generic crime," Williams's RICO conviction is not a qualifying offense under the modified categorical approach. *See Descamps v. United States*, 570 U.S. 254, 261 (2013).

Would the Supreme Court really conclude that Williams's RICO conviction did not constitute a "controlled substance offense"? I think not. The predicate acts underlying Williams's conviction included the distribution of and possession with intent to distribute: (1) in excess of a kilogram of heroin; (2) in excess of 50 grams of cocaine base; (3) in excess of 5 grams of cocaine base; (4) less than 5 grams of cocaine base; and (5) less than 100 grams of heroin. The enumeration of these predicate acts plainly establishes that Williams's RICO conviction is for a controlled substance offense.

To hold that it is not defies common sense not only in this case, but in *any* RICO case predicated on federal drug crimes. This is so because in every such case the "element" that *Taylor* and *Mathis* require us to compare to USSG § 4B1.2(b) will be the same: 18 U.S.C. § 1961(1)(D). *See* Maj. Op. 18–19. An application of the modified categorical approach will thus generate the same nonsensical answer—that a RICO conviction based on controlled substance offenses is not a "controlled substance offense"—every time.

I cannot accept that Congress, the United States Sentencing Commission, or the Supreme Court would endorse such an absurd result. Accordingly, I would hold that the approach the Court has articulated in cases like *Taylor*, *Descamps*, and *Mathis* does not apply here. The categorical

3

approach was developed to ensure that federal defendants who have committed essentially the same crimes in the past don't receive disparate sentences merely because they committed those prior offenses in different states. *See Taylor*, 495 U.S. at 591–92. That policy justification has no relevance here, where the nature of the prior federal conviction is clear on the face of the docket.

Were the Supreme Court confronted with the question before us, I think it would not attempt to pound the square peg of RICO into the round hole of the categorical/modified categorical approach. It would be especially surprising for the Court to do so not only because the predicate offense at issue here is markedly different from the state burglary crimes at issue in *Taylor* and *Mathis*, but also because several Justices have expressed dissatisfaction with the categorical approach generally.[1] For these reasons, I would not apply the categorical approach of *Taylor* and *Mathis* to the RICO offense at issue here. Instead, I would hold that Williams's RICO conviction

[1] *See, e.g.*, *Mathis*, 136 S. Ct. at 2258 (Kennedy, J., concurring) ("[T]oday's decision is a stark illustration of the arbitrary and inequitable results produced by applying an elements based approach to this sentencing scheme."); *id.* at 2268 (Alito, J., dissenting) (categorical approach "has increasingly led to results that Congress could not have intended"); *see also Shepard v. United States*, 544 U.S. 13, 27 (2005) (Thomas, J., concurring in part and concurring in the judgment) (criticizing *Taylor*'s implications for factfinding at sentencing in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000)); *id.* at 35–36 (O'Connor, J., joined by Kennedy and Breyer, JJ., dissenting) ("The Court's overscrupulous regard for formality leads it not only to an absurd result, but also to a result that Congress plainly hoped to avoid.").

was, on its face, a controlled substance offense that counted toward the USSG § 4B1.1 career offender enhancement.

\* \* \*

For the reasons stated, I join the Court's opinion regarding the denial of Williams's motion to suppress, and I concur in the Court's judgment that Williams is a career offender.

ROTH, J., Concurring

Although I agree with the reasoning and the conclusions of the majority opinion, which I in fact wrote, I write separately because of my concern that the categorical approach, along with its offspring, the modified categorical approach, is pushing us into a catechism of inquiry that renders these approaches ludicrous. The categorical approach was developed to avoid the "practical difficulties and potential unfairness" inherent in "determining the precise facts underlying a defendant's conviction when those facts are not plain from the elements of the offense itself."[1]

Given the unique structure of RICO, we are able to determine easily what predicate offenses led to the RICO conviction. There is no possibility of lack of precision. RICO's cross-referential and multi-layered structure makes it unlike other criminal statutes. Williams pleaded guilty to a RICO violation under 18 U.S.C. § 1962(c). Section 1962(c) proscribes participating in the conduct of an interstate enterprise's affairs through a "pattern of racketeering activity," which RICO defines as "at least two acts of racketeering activity."[2] Thus, as we recently recognized, in order to a make out a § 1962(c) RICO violation, the government must prove beyond a reasonable doubt that the defendant himself engaged in at least two predicate acts of racketeering.[3] Because a guilty plea requires a defendant to

---

[1] *United States v. Robinson*, 844 F.3d 137, 142-43 (3d Cir. 2016).
[2] 18 U.S.C. § 1961(5).
[3] *United States v. Ferriero*, 2017 WL 3319283, at *6 (3d Cir. Aug. 4, 2017)

admit to every element of the offense, a defendant pleading to a RICO violation must therefore admit to at least two predicate acts. The mere showing of any two predicate acts of racketeering alone, however, is not enough to sustain a 1962(c) RICO conviction. The law requires a jury to unanimously agree on the specific racketeering acts committed by the defendant and to find all the elements of those predicate acts. [4] By the terms of the statute, the two predicate racketeering acts are inextricably linked to the substantive § 1962(c) violation, and a RICO conviction cannot stand without them.

In this situation, I see no need to determine whether § 1962(c) is a divisible statute; I see no need to discuss the alternative forms of conduct covered by it; I see no need to decode the offense of conviction or to ask whether it sweeps more broadly than the relevant generic offense.

Instead, I should be able to look at the RICO conviction and the integrated predicate acts. The predicate acts here are drug offenses, violations of 21 U.S.C. §§ 841(a)(1) and 846, both controlled substance offenses. Voila, we can ascertain the precise facts underlying the defendant's conviction. The contortions of the modified categorical approach are needless.

---

(citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 371 (3d Cir. 2010)).

[4] *United States v. Brown*, 583 F.2d 659 (3d Cir. 1978); *see also* Mod. Crim. Jury Instr. 3rd Cir. 6.18.1962C-8 (instructing that a jury must unanimously agree on the specific racketeering acts committed by the defendant).

I write separately to explain this approach with the hope a future panel may see that there is no need, in the case of a RICO conviction, to engage in the catechism of the modified categorical approach.

FISHER, *Circuit Judge*, concurring.

I join the majority opinion except for Part II.A. There, the majority rules that consent to a search may be revoked, but that Carlton Williams did not do so. I would hold that he did. I am concerned that the majority's ruling erects obstacles that will make it difficult, in the future, for individuals to withdraw consent to police searches. I nevertheless concur in the result because—taking consent out of the equation—there was probable cause to search Williams's car.

I.

I agree with the majority's ruling, joining other Circuits, that consent to search may be revoked. A person may "delimit as he chooses the scope of the search to which he consents," and the scope of the consent is measured by asking, "[W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251-52 (1991).

I also agree with the majority's recounting of the facts, which is largely as follows. Trooper Michael Volk pulled Williams over on the Pennsylvania Turnpike, gave him a warning, told him he was free to go, and then asked if he would consent to a search of his car. Williams signed the proffered consent form. Then, for an hour and ten minutes on a dark winter night, he stood on the side of the highway with a second state trooper, Trooper Vresh, while Trooper Volk searched his car. A third trooper, Trooper Brautigam, also arrived shortly after the stop began.

Williams testified at the suppression hearing that he eventually said, "[Y]ou searched my car three times, now you hold me up and I have to go." *United States v. Williams*, No. 2:14–cr–30, 2015 WL 5602617, at *6 (W.D. Pa. 2015). The

1

District Court found this testimony "only credible to a degree" because it was not audible on the video from the dashboard-mounted camera in Trooper Volk's cruiser.[1] *Id.* The District Court does not explain the impact of its assessment that Williams's credibility on this point was less than total. Instead, the opinion simply goes on to note that "there is no evidence that Trooper Volk heard Williams' alleged comments, assuming such were made." *Id.*

Later in the search, Williams asked for his cell phones, which were in his car. Trooper Brautigam got them and began to read messages on one of the phones. Williams said that the officers could not search his phone without a warrant. When the troopers began to disassemble the stereo speakers in his trunk, Williams protested, "[Y]ou need a warrant to go through my speakers." *Id.* In the ensuing exchange, Williams said, "I've been out here half an hour, man" (this was an understatement; it had been more than fifty minutes). *Id.* Finally, Trooper Volk discovered heroin hidden in the parking brake assembly. *Id.*

I agree with the majority that when Williams said he had been "out [there] half an hour," he could have been expressing impatience rather than withdrawing consent. But I view differently his earlier statement: "[Y]ou searched my car three times [and] y'all got me on the side of this road in the middle

---

[1] A review of the video makes clear that the microphone was on Trooper Volk's person. It clearly picked up everything Trooper Volk said, and less clearly picked up others' speech when they were speaking with him. It faintly and sporadically picked up other sounds, including comments by Williams and the trooper or troopers standing near him. When Trooper Volk got into his cruiser and closed the door, the road noise and all other sounds died away.

of the winter holding me up and *I got to go*." Maj. Op. II.A. (emphasis added). I believe that a typical reasonable person would interpret this statement as withdrawing consent to any further search. *See Jimeno*, 500 U.S. at 251-52 (asking what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect"). Indeed, it would be difficult to withdraw consent much more clearly, aside from saying, "Stop," or "I no longer consent." As the majority rightly notes, no one should have to say "a special set of words to withdraw consent." Maj. Op. II.A. The majority's holding, though, may render anything short of a "special set of words" insufficient.

My position arguably conflicts with the Eighth Circuit, which ruled that a defendant's "indicat[ion] that he needed to be on his way" did not withdrawal consent to a search. *United States v. Ross*, 263 F.3d 844, 846 (8th Cir. 2001). Regardless of any conflict, however, I believe that the majority disregards the "reasonableness" that is the "touchstone" of the Fourth Amendment, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted), when it requires something more than Williams's simple, direct statement that he needed to go.

The majority supports its holding by saying that Williams knew how to withdraw consent because he "told the troopers that they did not have consent to search his speakers or his cellular phones." Maj. Op. II.A. But Williams did not say that, and the inaccuracy of the majority's paraphrase is consequential. Williams actually said that the troopers needed a warrant to search his speakers and cell phone. He was wrong, so his statements show only that he misunderstood Fourth Amendment law. *See California v. Acevedo*, 500 U.S. 565, 580 (1991) (generally, search of speakers would be permissible because warrantless search of an automobile encompasses "the containers within it"); *Williams*, 2015 WL 5602617, at *10

3

("Under existing law at the time, Trooper Brautigam was authorized to examine Williams' cell phones."). As a logical matter, Williams's attempt to assert garbled Fourth Amendment "rights" does not bear on whether he knew how to withdraw consent to a search. If anything, his comments show that he lacked an understanding of his rights that would have permitted him to speak with the level of clarity the majority seems to want.

The majority further supports its conclusion by noting that there was no evidence—aside from Williams's own testimony—that Trooper Volk heard his comment, "[Y]ou searched my car three times, now you hold me up and I have to go." I do not believe that Trooper Volk's ability to hear this comment is relevant. As the majority notes, he was assisted by two other troopers. The District Court found, more specifically, that Troopers Vresh and Brautigam arrived partway into the traffic stop, and that "Trooper Volk . . . directed [Williams] to wait with Trooper Vresh while Volk searched the vehicle." *Id.* at *5. The record fully supports this finding, to which I defer. The dash camera video shows Williams walking off camera with Vresh to wait as directed, and then shows Brautigam walking on and off camera, clearly going back and forth between Williams's car and where Williams was standing with Vresh. Because the troopers were working as a team, Williams should have been able to withdraw consent by speaking to any of them. The District Court made no findings with regard to whether Troopers Vresh or Brautigam could hear Williams's comment, but the record shows that they, not Trooper Volk, were the ones in a position to hear Williams.

## II.

Despite the fact that I believe Williams withdrew his consent to the search, I would affirm the District Court's denial

4

of the suppression motion because there was probable cause to search Williams's car.

The facts leading up to the Turnpike stop were these. A confidential informant conducted two controlled buys of heroin from Williams in November and December 2012. Based on the way the drug was packaged, Pittsburgh Police task force Detective Eric Harpster believed the heroin was from Detroit. The detective obtained a warrant to install a tracking device on Williams's car. On the day of the fateful traffic stop in January 2013, Detective Harpster tracked the car as it drove from Pittsburgh to Detroit, made a very quick turnaround, and drove back toward Pennsylvania. Detective Harpster contacted Trooper Volk. He asked Trooper Volk to conduct a traffic stop and try to find any heroin that might be in Williams's car.

"The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)). In *Burton*, a confidential informant attempting to make a controlled buy of a small amount of cocaine unwittingly interrupted what appeared to be a large drug transaction taking place in a particular house. *Id.* at 94-95. A police drug task force, alerted to the large transaction, saw the defendant leave the house in question. *Id.* at 95. He put a plastic bag in the trunk of a car, made a telephone call, and drove away. *Id.* We ruled that the police had probable cause to search the car at that point "[b]ecause [they] observed Burton leave what they thought to be a drug deal and place the results of that transaction inside his trunk." *Id.* at 100.

"The probable cause inquiry is 'commonsense,' 'practical,' and 'nontechnical;' it is based on the totality of the circumstances and is judged by the standard of 'reasonable and

5

prudent men.'" *United States v. Donahue*, 764 F.3d 293, 301 (3d Cir. 2014) (quoting *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)). "At bottom," the probable cause analysis "deal[s] with probabilities." *Id.* (quoting *Gates*, 462 U.S. at 231). Here, the probable cause determination is similar to *Burton*. Williams had previously sold heroin that appeared to be from Detroit to a confidential informant. Williams's car traveled to Detroit on the day in question, turned around quickly, and started traveling back. Looking at these facts in a practical and nontechnical fashion, the probability was that Williams had picked up drugs in Detroit and was bringing them back to Pittsburgh. Therefore, the police had probable cause to search the car regardless of whether Williams consented.

Contrary to Williams's argument, Detective Harpster was not required to recount the full probable cause analysis to Trooper Volk. "[T]he arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause." *Burton*, 288 F.3d at 99. Nor is Williams persuasive when he implies that Detective Harpster needed to impart a certain quantum of information to Trooper Volk; we have held that "[a]n officer can lawfully act solely on the basis of statements issued by fellow officers . . . ." *Id.* at 99 (quoting *Rogers v. Powell*, 120 F.3d 446, 453 (3d Cir. 1997)). Finally, the situation did not need to be "dynamic" or "fast-paced" in order to justify Trooper Volk's reliance. The situation in *Burton* was not particularly dynamic or fast-paced, but even so, we concluded that the arresting officer could rely on the task force officer's instruction. *See id.* at 94-96.

### III.

For these reasons, I concur in the judgment affirming the denial of the suppression motion. However, I would not

6

reach that result on the basis that Williams consented to the search (and failed to effectively withdraw his consent). Instead, I would hold that although he withdrew consent, there was probable cause to search his car. This analysis is more faithful to our Fourth Amendment jurisprudence, and in particular, the reasonableness that is its touchstone.